**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

**ULLA E. RICHTNER,**

     **Plaintiff,**

**vs.**                                                    **CASE NO.   1:18cv25-MW/CAS**

**NANCY A. BERRYHILL,
Deputy Commissioner for
Operations, Social Security
Administration,**

     **Defendant.**
_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Deputy Commissioner for Operations (Commissioner) denying Plaintiff's application for widow's insurance benefits pursuant to the Social Security Act (SSA).   ECF No. 1.   The Commissioner has filed an Answer ECF No. 9, and both parties filed memoranda.   ECF Nos. 12, 13.   Based upon a review of the entire record, it is respectfully recommended that the decision of the Commissioner be reversed and remanded.

## I. Procedural History

Plaintiff requests payment for widow's insurance benefits pursuant to the SSA.   She claims she is entitled to such benefits as a result of her common-law marriage to Olle I. Elgerd (Elgerd), the wage earner (WE). According to Plaintiff, the common-law marriage began on June 13, 1985, when she and Elgerd, who were residents of Florida, moved to Eldora, Colorado, for the summer (returning to Florida after the summer months) and thereafter lived together as husband and wife until his death on August 30, 1997.   Plaintiff was formally married to Elgerd on May 10, 1997, in Florida, but he died in August 1997.   Plaintiff was not formally married to Elgerd for at least nine months, thus she had to rely on her prior common-law marriage in order to satisfy the SSA marriage requirement for widow's insurance benefits.

Her quest for benefits began on May 1, 2006, at the age of 65, when she met with a Social Security official who, according to Plaintiff, asked her "pertinent questions about [her] marriage, and said [their] ceremonial marriage had not been long enough.   When [she] told her that [she] and [her] husband had, for the most part, had a common-law marriage, she said that it was not recognized in Florida."   Tr. 25 (Plaintiff's affidavit (Mar. 7,

2012)); *see* Tr. 121-25; *see also* (Tr. 166-69 (eNon-Disability Summary Sheet) for a chronology of Plaintiff's filings).   The SSA document memorializing the conversation notes Elgerd was previously married and Plaintiff was last married to Elgerd on May 10, 1997, in Florida "by a clergyman or public official."   Tr. 122.   There is no mention of a purported common-law marriage.   Tr. 121-23.   This conversation was memorialized in a document sent to Plaintiff at a Gainesville, Florida, address.   Plaintiff was told to review her application to ensure her statements were recorded correctly, that she could retain the application for her records if she agreed with her statements, and that she should contact SSA personnel if she disagreed with any of her statements.   Tr. 124-25.   The application was denied on May 6, 2006, because Plaintiff was not married to Elgerd for at least nine months before he died on August 30, 1997.[1]   Tr. 126, 504. Plaintiff did not appeal the denial of the 2006 application.

---

[1]   On a June 12, 2007, SSA application for hospital insurance benefits, Plaintiff indicated she married Elgerd on May 10, 1997, in Florida by a clergyman or public official and the marriage ended by death on August 30, 1997.   Tr. 132, 504.   This document referred to the May 1, 2006, conversation although referring to an application for hospital insurance.   Tr. 132.   Remarks indicate that Plaintiff was applying for Part B of Medicare only; she was covered under Elgerd's State of Florida health insurance. *Id.*

The next record of Plaintiff's application for widow's retirement insurance benefits occurred on March 4, 2011, and memorialized on March 7, 2011.   Tr. 134-38.   (At that time, Plaintiff was represented by Arthur H. Johnson, an attorney and Plaintiff's current counsel and Plaintiff "was taking the position that a common-law marriage had formed under Colorado law."   Tr. 460.)   It is stated that Plaintiff was previously married to Elgerd on June 13, 1986, in Colorado and the marriage ended with his death on August 30, 1997.   Tr. 134.   Information sheets dated March 4, 2011, follow the March 7, 2011, SSA form, Tr. 136-38, and state that she became a naturized citizen of the United States on March 25, 2010. Tr. 136.   She was no longer married.   *Id.*   Her prior marriage to Elgerd lasted ten years; it began on June 13, 1986, in Boulder, Colorado, and was a common-law marriage and ended upon his death.   Tr. 136-37.   On March 12, 2011, the SSA advised Plaintiff that she did not qualify for retirement benefits because she had not worked long enough under Social Security to receive benefits on her own record.   Tr. 139.   On or about May 15, 2011, Plaintiff, by counsel, requested reconsideration.   Tr. 95-119, 471.

On December 22, 2011, Plaintiff discussed with SSA staff and completed an application for Social Security benefits under Elgerd's name. Tr. 149-50, 505.   Plaintiff did not file for SSI benefits.   Tr. 150.   The SSA form memorializes that Elgerd was last married to Plaintiff and she was last married to Elgerd on June 13, 1985, in Colorado by a clergyman or public official and the marriage ended by his death on August 30, 1997.   Tr. 150. It is noted Elgerd was not previously married although he had been, but his former wife passed away in August 1984.   Tr. 150, 507.   Under remarks, it is noted: "We were married under Colorado common law statutes.   We started living in Colorado in the eighties and referred to each other as husband and wife."   Tr. 150; *see* Tr. 505.   The claim was denied on January 23, 2012, and on March 7, 2012, Plaintiff, by current counsel, requested reconsideration.   Tr. 56-60, 151-55, 436-38; *see* Tr. 505.   On April 3, 2012, reconsideration was denied and SSA stated, in part: "In some States, a valid marriage may be created without a formal ceremony. These marriages are called common-law marriages.   A common-law marriage is not recognize[d] in the State of Florida."   Tr. 157.

On May 1, 2012, Plaintiff, by counsel, requested a hearing by an ALJ based on the SSA's failure to consider the Colorado common-law marriage

and Florida's recognition of out-of-state common-law marriage.   Tr. 160.
On October 12, 2012, Plaintiff's counsel provided the SSA with a list of
exhibits and the exhibits to be included in the record.   Tr. 178-179 (letter
with exhibits identified in the record as Exhibit 18, pp. 1-45, Tr.180-222).

A hearing was held before Administrative Law Judge (ALJ) Kelley
Fitzgerald on January 8, 2013.   Tr. 472-500.   Plaintiff was represented by
Mr. Johnson.   Tr. 472, 474; *see* ECF No. 12.   Plaintiff testified.   Tr. 477-
96.   Elizabeth Elgerd, the Elgerd's daughter, also testified.   Tr. 496-98.   It
appears the record before the ALJ for this 2013 hearing consisted of
Exhibits A1 through 24, *see* Case No. 1:14cv204-GRJ, ECF No. 9-1 at 1-
435 in that case.   *See* Tr. 1-3A (list of exhibits in the current record, Case
No. 1:18cv25-MW/CAS, which is the same record in prior case, *see*
Tr. 474-75).   (Exhibit A, page 1, in the current record, appears as the next
page after the ALJ's May 31, 2013, decision.   Tr. 16.)

The last page in the prior record before this Court is 500, the last
page of the January 8, 2013, hearing transcript.   *See* Case No. 1:14cv204-
GRJ, ECF No. 9-4 in that case.)   Page 500 in the current record is the
same page.   Tr. 500.

On May 31, 2013, the ALJ denied Plaintiff's application for benefits

and determined, in part, that Plaintiff was not married to Elgerd for nine

months preceding his death and, therefore, did not meet the marriage

durational requirement set forth in 20 C.F.R. § 404.335(a)(1) stating:

> We will find you entitled to benefits is the widow or
> widower of a person who died fully insured if you meet the
> requirements in paragraphs (a) through (e) of this section:
>
> > (a) You are the insured's widow or widower based upon
> > a relationship described in §§ 404.345 through 404.346,
> > and you meet one conditions in paragraphs (a)(1)
> > through (a)(4) of this section:
>
> > (1) Your relationship to the insured as a wife or husband
> > lasted for at least 9 months immediately before the
> > insured died.

Tr. 15.   The undisputed facts show that Plaintiff and Elgerd were married

in the State of Florida on May 10, 1997, and he died on August 30, 1997.

Tr. 12, 15.   The dispute focused and continues to focus in this case on

whether Plaintiff and Elgerd were married as a result of a common-law

marriage in the State of Colorado for at least nine months prior to his death.

The ALJ determined they were not based, in part, on a finding that they

were not *residents* of Colorado, having erroneously assumed that Colorado

residency is an essential element of establishing a common-law marriage

under Colorado law.   Tr. 12, 14.   On August 1, 2013, Plaintiff requested

review by the Appeals Council.   Tr. 443.   On September 3, 2013, Plaintiff was granted more time to submit additional evidence or a statement about the case.   Tr. 444, 446.   Thereafter, Plaintiff's counsel submitted a detailed brief.   Tr. 448-70.   On August 23, 2014, the Appeals Council denied Plaintiff's request for review.   Tr. 4-7.

Plaintiff sought judicial review in this Court, Case No. 1:14cv204-GRJ, ECF No. 1, in that case.   The parties filed memoranda that were considered.   ECF Nos. 13, 14 in that case; *see* Tr. 512.   On March 25, 2016, U.S. Magistrate Judge Gary R. Jones reversed and remanded the case for further proceedings "so that the ALJ can re-evaluate and weigh the evidence of whether Plaintiff and Elgerd had a common-law marriage under Colorado law, without incorrectly assuming that Colorado residency is an essential element establishing a common-law marriage under Colorado law."[2]   Tr. 536.   On June 8, 2016, the Appeals Council remanded the case to ALJ Fitzgerald with the instructions noted above.   Tr. 504, 546-47.

---

[2]   Judge Jones meticulously summarized the evidence in the case.   ECF No. 15 in that case; *see* Tr. 515-23, 525-36.   After discussing Colorado law on this subject, Judge Jones stated:

> The Commissioner says that Plaintiff and Elgerd mainly had a "habit of visiting" or "remaining with" each other in Colorado, which is insufficient under <u>Taylor</u> to constitute a common law marriage.   This argument ignores the wealth of evidence in the record demonstrating that for twelve years when Plaintiff and Elgerd were in Colorado, they lived together as husband and wife in the Colorado

On July 14, 2017, the ALJ conducted a hearing.   Tr. 504, 610-20.

Plaintiff was represented by Mr. Johnson.   No additional exhibits were

offered and the decision was made on the prior record.[3]   *Id.*   On

November 8, 2017, ALJ Fitzgerald determined Plaintiff was a resident of

the State of Florida when she applied for widow's insurance benefits;

Plaintiff and Elgerd were married in the State of Florida on May 10, 1997;

the record did not establish a Colorado common-law marriage between

Plaintiff and Elgerd prior to May 10, 1997; Elgerd passed away on August

30, 1997; Plaintiff and Elgerd did not meet the nine-month durational

---

home.   And there is no dispute on the evidence presented that Plaintiff and Elgerd presented themselves to the community in Colorado (as well as to the community of Florida) as husband and wife. . . . Plaintiff and Elgerd's relationship in Colorado, therefore, is not at odds with <u>Taylor</u>' and evidences a twelve year record more than sufficient to demonstrate "cohabitation" and "repute."

Tr. 531-32.

   [3]   The ALJ inquired of counsel whether she was "missing anything" needed for the determination and then stated: "It seems like at least the bulk of your case, if not the entirety of the case, is based on statements; is that correct?" to which counsel replied "Yes."   Tr. 615.   Counsel believed statements show there was a marriage prior to 1997.   Tr. 616.   The ALJ replied: "Well, no, other than the statements.   I know we have statements.   We have the testimony of Ms. Richtner.   And I'm just wondering if there are any legal documents that show that they were married prior to the ceremonial marriage?" and counsel replied, "No, there aren't."   *Id.*   Counsel also stated: "The only determination of a common law marriage prior to this was by the INS, Immigration and Naturalization Service," page 21 of Exhibit A, Tr. 36.   Tr. 616-17.   The hearing concluded with counsel stating: "[W]e have a substantial record as it is.   We're going to rely on the record as it stands."   Tr. 619.   At the hearing, counsel did not refer to or take any exception to any finding(s) by the ALJ in the prior decision, Tr. 11-15.   Tr. 610-20.

requirement; and Plaintiff is not entitled to widow's insurance benefits on the earnings record of Elgerd.   Tr. 510.   Plaintiff did not seek review by the Appeals Council.   Plaintiff timely filed a Complaint in this Court and the case is ripe for judicial review pursuant to 42 U.S.C. § 405(g).   ECF No. 1.

## II.   Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence.   *See* 42 U.S.C. § 405(g).   "We review the Commissioner's decision to determine if it is supported by substantial evidence and based on proper legal standards."   <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1439 (11th Cir. 1997).   "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."   *Id.*

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *See* <u>Edwards</u>, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *see also* <u>Ellison v. Barnhart</u>, 355 F.3d 1272, 1275 (11th Cir. 2003).   The district court must review the evidence as a whole, taking into account evidence favorable as

well as unfavorable to the decision.   Lowery v. Sullivan, 979 F.2d 835, 837

(11th Cir. 1992) (holding the Court must scrutinize the entire record to

determine the reasonableness of factual findings); Parker v. Bowen, 793

F.2d 1177 (11th Cir. 1986) (finding the court also must consider evidence

detracting from evidence on which the Commissioner relied).   The district

court will reverse the Commissioner's decision on plenary review, however,

if the decision applies incorrect law, or if the decision fails to provide the

district court with sufficient reasoning to determine that the Commissioner

properly applied the law.   Keeton v. Dep't of Health and Human Servs., 21

F.3d 1064, 1066 (11th Cir. 1994).

The SSA provides for widow's insurance benefits for a surviving

spouse of an individual who died fully insured.   The widow must have been

married to the individual for at least nine months prior to his or her death.

42 U.S.C. §§ 402(e)(1), 416(c)(1)(E); 20 C.F.R. § 404.335(a)(1).   The

relationship is determined by the laws of the State where the insured had a

"permanent home" at the time of death – "permanent home" meaning "the

true and fixed home (legal domicile) of a person.   It is the place in which a

person intends to return whenever he or she is absent."

42 U.S.C. § 416(h)(1)(A)(i); 20 C.F.R. §§ 404.303, 404.345.

At the time of his death, Elgerd's permanent home was in Florida.

Although Florida has not recognized common-law marriages since 1967,

*see* section 741.211, Florida Statutes, Florida law recognizes common-law

marriages validly entered in a state where common-law marriages are

permitted.   Anderson v. Anderson, 577 So.2d 658, 660 (Fla. 1st DCA

1991).   Colorado permits common-law marriage.   In Re Marriage of

J.M.H. & Rouse, 143 P.3d 116, 117 (Colo. App. 2006); Colo. Rev. Stat.

§ 14-2-109.5.

Highly instructive on the issue of what is required for a common-law

marriage in Colorado is the discussion by the Colorado Supreme Court in

People v. Lucero, 747 P.2d 660 (Colo. 1987).   The issue in Lucero was

whether the defendant had entered into a common-law marriage and thus

could apply the marital privilege against testimony by his spouse.   The

Court stated: "A common-law marriage is established by the mutual

consent or agreement of the parties to be husband and wife, followed by a

mutual and open assumption of a marital relationship."   *Id.* at 663 (citations

omitted).   Tthe Court affirmed "that such conduct in a form of mutual public

acknowledgment of the marital relationship is not only important evidence

of the existence of mutual agreement but is essential to the establishment

of a common law marriage.   The reason for this requirement is to guard

against fraudulent claims of common law marriage."   *Id*. at 663-64.

> The very nature of a common law marital relationship makes it likely
> that in many cases express agreements will not exist.   The parties'
> understanding may be only tacitly expressed, and the difficulty of
> proof is readily apparent.   We have recognized that "the agreement
> need not have been in words," and the issue then becomes what sort
> of evidence is sufficient to prove the agreement.   We have stated
> that if the agreement is denied or cannot be shown, its existence may
> be inferred from evidence of cohabitation and general repute.   In
> such cases, the conduct of the parties provides the truly reliable
> evidence of the nature of their understanding or agreement."[4]

*Id*. at 664 (citations omitted).   "Courts have increasingly relied on the

conduct of the parties to infer than an agreement also existed."   *Id*.

Stated otherwise, "[s]ince an express agreement is unlikely to exist, courts

have looked to the parties conduct to establish the existence of such an

agreement."   <u>Trustees of the Colo. Contractors Trust v. Frawley</u>, 112 B.R.

32, 33 (D. Colo. 1990).

---

4   After this quotation, the Court referred to a prior case wherein it was "noted
that evidence concerning a common law marriage 'should be clear, consistent and
convincing.'"   *Id*. at 664 n.6 (citation omitted).   The Court then stated: "This language
was not chosen in order to establish a higher burden of proof for those attempting to
prove a common law marriage, but instead merely stresses that the parties must
present more than vague claims unsupported by competent evidence."   *Id*.   In Social
Security cases, it is generally said that the issue is not whether the evidence may
support the claimant's allegations or whether the Court might reach a different
conclusion based on its review of the evidence.   *See* <u>Ellison</u>, 355 F.3d at 1275.   The
issue is whether substantial evidence supports the ALJ's decision.   *Id*.

The Court recognized that "[o]ur formulations of the requirement of conduct manifesting or confirming the parties' understanding or agreement have taken many forms."   Lucero, 747 P.2d at 664 (citations omitted).

> The two factors that most clearly show an intention to be married are *cohabitation* and a general understanding or *reputation* among persons in the community in which the couple lives that the parties hold themselves out as husband and wife.   Specific behavior that may be considered includes maintenance of joint banking and credit accounts; purchase and joint ownership of property; the use of the man's surname by the woman; the use of the man's surname by children born to the parties; and the filing of joint tax returns.   See Mills, Common Law Marriage in Colorado, 16 Colo. Law. 252, 257 (1987).   However, there is no single form that any such evidence must take.   Rather, any form of evidence that openly manifests the intention of the parties that their relationship is that of husband and wife will provide the requisite proof from which the existence of their mutual understanding can be inferred.

*Id.* at 665 (emphasis added).   Cohabitation is "the act or state of dwelling together, or in the same place with another."   Taylor v. Taylor, 50 P. 1049 (Colo. App. 1897).   Repute means "the understanding among the neighbors and acquaintances with whom the parties associate in their daily life that they are living together as husband and wife."   *Id.* at 1050.   In Lucero, the Court noted that "we have generally not treated evidence of cohabitation and repute as creating a presumption of a common law marriage.   Instead, sufficient evidence of cohabitation and reputation may give rise to a permissible inference of common law marriage."   747 P.2d at

664 n.5 (citations omitted).    Nevertheless, "[a] determination of whether a common law marriage exists turns on issues of fact and credibility, which are properly within the trial court's discretion."    Lucero, 747 P.2d at 665 (citations omitted).

## III.    The Evidence

This is a fact-intensive case, and, as a result, the ALJ's findings are a critical component for this Court's consideration.    In the prior case, Plaintiff took issue with several material findings made by the ALJ.    *See* Case No. 1:14cv204, ECF No. 13 in that case at 15-33; *see also* Tr. 449-70 (brief submitted to Appeals Council).    Not so now.    ECF No. 12.    Rather than provide a piecemeal statement of the evidence, the legal issue before the Court compels a recitation of the ALJ's assessment of the evidence.

> The claimant applied for Widow's benefits on May 1, 2006 at which time, she indicated that she was married to the deceased, Ollie [sic] I. Elgerd on May 10, 1997 by a clergyman or public official in the state of Florida (Exhibit 1) [Tr. 122].    Mr. Elgerd died on August 30, 1997 (Exhibit 22F, pg.18).    The claim was denied on May 6, 2006, because the claimant was not married to Mr. Elgerd for at least nine months before he died (Exhibit 2) [Tr. 126-28].    On a June 12, 2007 application for hospital benefits, the claimant also indicated she married the deceased on May 10, 1997 (Exhibit 4, pg.1) [Tr. 132].    The claimant reapplied for widow's benefits on December 22, 2011 (Exhibit 8) [Tr. 149-50].    In her application, the claimant indicated that she and the wage earner had been married on June 13, 1985 by a

clergyman or public official, and were married under Colorado common law statutes (Exhibit 8, pg.2) [Tr. 150]. She stated that they started living in Colorado in the eighties and referred to each other as husband and wife.   The claim was again denied and it was noted that the claimant did not qualify for widow's benefits (Exhibits 10 and 25) [Tr. 156-58 (Apr. 3, 2012), 436-38 (Jan. 23, 2012)].

At the most recent hearing, the claimant's representative indicated that he did not have additional exhibits to add to the record.   It was specifically noted that there was no acknowledgement from a Colorado state official regarding whether the requirements of a common law marriage had been met.   At the prior hearing, the claimant testified that she and the wage earner moved to Eldora, Colorado on June 13, 1985 and that the common-law marriage started on that day.   She stated  that they lived together in a home that the wage earner owned and that they stayed there for the summer (Tr. page 477).   Additional testimony was not taken from the claimant at the most recent hearing [Tr. 610-20]. In addition, at the prior hearing, Elizabeth Elgerd, the wage earner's daughter testified that she first met the claimant in the fall of 1984 (Tr. page 472) [Tr. 497].   She had previously met her at some "Swedish" parties.   She acknowledged that she had heard her father introduce the claimant to others as his wife [*Id.*].

After reviewing the record and listening to the testimony, I find that, for purposes of entitlement to widow's insurance benefits under the Social Security Act, the claimant has not established that she and the wage earner were married at any time prior to the May 10, 1997 marriage in the State of Florida.   The Court Order required that I reconsider whether the claimant and the deceased wage earner had a common law marriage under Colorado law, without incorrectly assuming that Colorado residency is an essential element of establishing common-law marriage under Colorado law.

There is documentary evidence establishing that the claimant married the wage earner in the State of Florida on May 10, 1997 (Exhibit 21) [Tr. 232], and that the wage earner died on August 30, 1997 (Exhibit 22F, p. 18) [Tr. 250].   20 CFR § 404.335(a)(1) provides for entitlement to benefits for a widow whose relationship to the insured as a wife or husband lasted for at least nine months  immediately before the insured died.   Hence, for purposes of the Social Security Act, the marriage did not last for at least 9 months immediately before the insured died for purposes of entitlement to widow's insurance benefits.

****

In this case, the substantial evidence does not establish that the claimant and decedent had such mutual agreement to be husband and wife prior to their ceremonial marriage in May 1997 as required by *Lucero*.   The claimant testified that that she began living with the decedent in June of 1985 in his summer home in Colorado [Tr. 477-78].   A title statement indicated that the wage earner owned the property with his first wife, Margaret Elgerd (Exhibit 22, pg. 48) [Tr. 280]. Margaret Elgerd passed away in August 1984 (Exhibit 22, pg. 20) [Tr. 252].   Every year after June 1985, the decedent and the claimant lived in the Colorado home for about ten weeks per year (Tr. 478-481).   While in Colorado that first year, they spent time with the decedent's natural children. The claimant reported that she later served as "mother of the bride" and "mother of the groom" in their weddings (Exhibit 9, pgs. 2-4) [Tr. 152-54].

However, the decedent's specific behavior contradicts that the parties had a mutual understanding to live as husband and wife as *Lucero* notes should be considered.   Id. at 660.   In fact, the decedent's behavior reflects that he considered himself to be a single man prior to the May 10, 1997 marriage in the State of Florida.   While the parties did have joint credit cards and shared health insurance, other legal documents were completed separately (Exhibit A, p. 15) [Tr. 30].   For the year

ending 1996, the year immediately before the legal marriage in Florida, the wage earner filed a United States tax return as a "single" individual (Exhibit 22 pg. 174) [Tr. 406].   There is no indication that the parties ever filed a joint tax return.   Also of note, the claimant, herself, filed a tax return in Sweden in June 1997 in which she also listed herself as a "single person." (Exhibit 22, pg. 118) [Tr. 350].   Further, the decedent declared himself a "single person" for purposes of deeding property into a trust in the State of Florida in [February 15,] 1996 (Exhibit 20, pg. 1) [Tr. 224, 229 (second warranty deed].   In a February [15,] 1996 Trust agreement, he also described himself as a "single person" (Exhibit 22, pgs. 64-79) [Tr. 296-311].[5]

When questioned about the 1996 U.S. tax return, the

---

5   Plaintiff did not own any property with Elgerd.   Tr. 483.   She does not know why Elgerd indicated he was a single person when he placed property into a trust.   *Id*. On February 15, 1996, a "Warranty Deed to Trustee" was executed by Elgerd and states that it is "between OLLE I. ELGERD, *a single person* . . . and OLLE I. ELGERD, as trustee under the Olle I. Elgerd Trust dated February 15, 1996.   Tr. 224-28 (Exhibit 20 at 1-5) (emphasis added).   The acknowledgement portion of this document states in part: "I HEREBY CERTIFY . . . personally appeared OLLE I. ELDGERD, *a single person*, to me known to be the person described in and who executed the foregoing instrument, and he acknowledged before me that he executed the same, and he did not take an oath."   Tr. 225 (emphasis added).   The notary public, an attorney, stated: "I hereby certify that the acknowledgement of the foregoing person is based upon personal knowledge."   Tr. 226.   The document is signed by Elgerd and witnessed.   Tr. 225.   A second warranty deed with similar language was executed on February 15, 1996.   Tr. 229-31.   On February 15, 1996, the "OLLE I. ELGERD TRUST" was executed by Elgerd and the document is between Elgerd, "*a single person*, now residing in Alachua County, Florida . . . and [Elgerd], *a single person*, hereinafter referred to as 'Trustee.'"   Tr. 296 (Exhibit 22 at 64-79) (emphasis added).   Under Article VI, distributions are mentioned in the event of Elgerd's death and the following distribution is mentioned: "C.   All cash in checking accounts and certificates of deposit shall be distributed as follows: 1.   Twenty percent (20%) to Grantor's *friend*, ULLA E. M. RICHTNER."   Tr. 300 (emphasis added); *see also* Tr. 301 similar reference of an amount "to Grantor's *friend*, ULLA E. M. RICHTNER."   Later in the same document "friend" is not mentioned when a distribution is to be made to Plaintiff.   Tr. 302 (emphasis added).   On May 6, 1997, a "First Amendment to Declaration of Trust" was executed by Elgerd and provides, in part, that Elgerd and Plaintiff "shall be Co-Trustees under this Trust."   Tr. 290.   This document also refers to Elgerd's daughter and son. *Id*.

claimant previously testified that the wage earner had read something pertaining to tax filing status and had told her that if they had filed married and it was not a "traditional" marriage, they would be living under a "lewd and suspicious something", which he did not want to do (Tr. 488).    Yet, neither the claimant nor her attorney provided this documentation, and neither the claimant nor her attorney provided documentation establishing that the Internal Revenue Service ("IRS") does not recognize Colorado common law marriages for tax filing purposes.    The claimant also offered no explanation as to why the wage earner declared that he was a "single person" in a 1996 Warranty Deed (Exhibit 20, p. 1) [Tr. 224] and 1996 Trust Agreement (Exhibit 22, pgs. 64-79) [Tr. 296-311].

The claimant provided other documents as proof that they had a common law marriage including a veterinary identification card with both parties' names, primary and companion flight coupons, a copy of a co-lease of a safe deposit box and letters from friends and neighbors indicating that they lived together as husband and wife (Exhibit A, pages 18, 22, 23, 29-38, 94-105; 18/35-45; 22/42, 97-106) [Tr. 33, 37-38, 44-54, 109-120, 212-20, 274, 329-38].    She did not provide evidence that she used decedent's surname on a consistent basis and she indicated she continues to use her maiden name (Exhibit 18, pg. 14) [Tr. 191].    Notably, when the decedent completed a Durable Power of Attorney in May 1997, before the legal·marriage, he appointed, "my friend ULLA RICHTNER" as his attorney in fact (Exhibit 22, pg. 86).[6]    If they were married, then I would expect that the wage earner would have referred to the claimant as "my wife."    The claimant notes that she is listed as his wife in his obituary in September 1997 (Exhibit 22, pg. 108) [Tr. 340]. However, by the time of his death, they were in fact, legally

---

6    It appears the "Durable Power of Attorney" was witnessed and notarized by a member of The Florida Bar in Gainesville, Florida, Tr. 318-22, who also witnessed other documents for Elgerd.   *See, e.g.*, Tr. 224-31, 289-312; *see also* Tr. 324 (warranty deed prepared by the same lawyer (Apr. 12, 1999)).

married in the state of Florida.

I find that the wage earner's sworn statements, including the Durable Power of Attorney (1997), Warranty Deed (1996), Trust Agreement (1996) and tax forms (1996), establish that he and the claimant were not married prior to May 1997.   Furthermore, if the claimant and the wage earner were already married under Colorado common law, then there would have been no need for the May 10, 1997 formal marriage in the State of Florida. Notably, when they applied for the Florida marriage license, the claimant and wage earner indicated that they were both residents of Florida but that they resided in different counties. She lived in Sarasota County and he lived in Alachua County (Exhibit 21) [Tr. 232].   The claimant previously testified that they entered into the Florida marriage because the wage earner had become sick, she had only six months left on her Visa, and they wanted to live in the United States together.   Additionally, the claimant stated that the wage earner was also concerned that she did not have health insurance and that they felt that it would be easier to obtain health insurance under the wage earner's employer plan if they had a traditional marriage [Tr. 481-84].   However, no documentation was provided to establish that the claimant was either denied insurance coverage, or would have been denied insurance coverage, because of an insurance provider's failure to recognize a Colorado common law marriage.   Furthermore, in an affidavit completed by the claimant in March 2012, she indicated that the wage earner had previously maintained insurance coverage for her, first through a Swedish insurance carrier and then through Blue Cross/Blue Shield. (Exhibit 18, pg. 14) [Tr. 191]. Hence, it appears that she already had insurance.

I also considered the claimant's argument that the Immigration and Naturalization Service ("INS") was ultimately satisfied that the claimant had established a common law marriage.   In support of that application, briefs were submitted from Professor Walter Weyrauch, from the University of Florida College of Law and Professor Homer

Clark, Jr., a professor of law from the University of Colorado (Exhibit 22, pgs. 8-11 and 23-29) [Tr. 240-43, 255-61]. Professor Clark concluded that there was clear, convincing, and consistent evidence that the couple were married under common law in Colorado.   Professor Weyrauch also supported Dr. Clark's conclusion.   Dr. Weyrauch noted that the parties' common law marriage would be recognized under Florida law and that the ceremony in Florida in 1997 was confirmation of the already existing marital status.   I gave these assessments some consideration, but find that the documentation in the record does not support the existence of a common law marriage prior to May 10, 1997 for the reasons discussed herein.   With respect to the ultimate conclusion by the INS, there are no laws requiring the Social Security Administration to adopt the decision of another governmental or non-governmental agency, especially as in this case where the findings of the Agency are not even made clear.   The claimant was only provided a summary approval notice, which indicated she was a widow of a United States citizen who died in the past two years pursuant to Section 201(b)(2)(a)(i). (Exhibit 21) [Tr. 36, 204, 232-39].   The claimant's position was that the Immigration and Nationality Act, 8 U.S.C. § 1151(b)(2)(A)(i) required a two-year marriage duration requirement for a person to be recognized as a widow of a deceased citizen (Exhibit 24, pg. 34) [*see* Tr. 233 (Exhibit 22 at 1 – attorney letter to INS)]. The actual text of that section is as follows:

> i) Immediate relatives.-
> For purposes of this subsection, the term "immediate relatives" means the children, spouses, and parents of a citizen of the United States, except that, in the case of parents, such citizens shall be at least 21 years of age.   In the case of an alien who was the spouse of a citizen of the United States and was not legally separated from the citizen at the time of the citizen's death, the alien (and each child of the alien) shall be considered, for purposes of this subsection, to remain

an immediate relative after the date of the citizen's death but only if the spouse files a petition under section 1154(a)(I )(A)(ii) of this title within 2 years after such date and only until the date the spouse remarries. For purposes of this clause, an alien who has filed a petition under clause (iii) or (iv) of section 1154(a)(I)(A) of this title remains an immediate relative in the event that the United States citizen spouse or parent loses United States citizenship on account of the abuse.

Immigration and Nationality Act, 8 U.S.C. § 1151(b)(2)(A)(i). The actual text seems only to indicate that the claimant must have filed her petition within 2 years of the wage earner's death.   Thus, this section does not provide support for the finding that the INS accepted that the parties had a valid common law marriage in Colorado.[7] .

In deciding that the claimant and the wage earner were not married prior to May 10, 1997, I also considered the briefs/memoranda submitted by the claimant's attorney, the testimony of the wage earner's daughter,[8] the statements from third parties, including friends, family and acquaintances in Sweden, Florida and Colorado, as well as documents provided to INS, and photos of the claimant and the wage earner at family events (Exhibits 8, 18, 22, 24, Exhibit "A").   While this documentation supports that the claimant and the wage earner enjoyed a long-term,

---

[7]   *See infra* at 30-35.

[8]   Elgerd's daughter testified during the hearing held on January 8, 2013. Tr. 496-98.   She first met Plaintiff in the fall of 1984, but had met her previously many years before at some Swedish parties but cannot remember dates as she was very young.   Tr. 497.   At some point Plaintiff began living with her father.   She had heard her father introduce Plaintiff as his wife that would have been in Florida and Colorado. *Id.*   She traveled frequently to Colorado and on many occasions to Sweden.   Most of her relatives live in Sweden except for one of her brothers who lives in Denver. Tr. 498.   From her experience, most of her relatives have not gone through a traditional wedding ceremony, but she and family consider them to be married, have children and live together as families.   *Id.*

committed relationship, I am not persuaded that this relationship rose to the level of marriage at any time prior to May 10, 1997.   It (sic) The wage earner completed multiple legal documents declaring that he was "single" during the time that the claimant alleges a common-law marriage. There is also no indication that the State of Colorado recognized that the claimant and the wage earner were married under its common law.

Accordingly, I find that for purposes of establishing entitlement to widow's insurance benefits under the Social Security Act, the claimant and the wage earner were not married at any time prior to May 10, 1997.

Tr. 504-09.

## IV.   Legal Analysis

### A.

This case presents a single question: whether the ALJ erred in determining that, under Colorado law, Plaintiff was not the common-law wife of the decedent Elgerd prior to his death, and, therefore, not entitled to widow's insurance benefits the Social Security Act?

### B.

The disposition of this case in favor of Plaintiff is relatively simple if the Court restricts its consideration to the "statements" of record including the sworn affidavit of Plaintiff and her hearing testimony, numerous letters from acquaintances, friends, statements of Elgerd's daughter and son,

family photographs, time spent together in Colorado, joint bank accounts, credit cards, a safe deposit box, maintenance of health insurance for Plaintiff by Elgerd, veterinary ID card, airline flight coupons, the resulting ceremonial marriage on May 10, 1997, and the briefs submitted by Professors Weyrauch and Clark in support of Plaintiff's INS application, and the INS decision.

Putting aside the inability to judge the credibility of Plaintiff and Elgerd's daughter who testified during the first hearing, the undersigned might be persuaded that the weight of the evidence, which is dominated by the "statements" of record, supports Plaintiff's claim.

The case for Plaintiff becomes clouded, however, when other evidence is considered, particularly when the evidence is viewed in light of whether Elgerd believed he was married to Plaintiff from June 1985, when they first lived together in Colorado, through and just prior to the ceremonial marriage on May 10, 1997.   The ALJ found to the contrary stating: "However, the decedent's specific behavior contradicts that the parties had a mutual understanding to live as husband and wife as *Lucero* notes should be considered.   *Id*. at 660.   In fact, the decedent's behavior reflects that he considered himself a single man prior to the May 10, 1997 marriage in

the State of Florida."   Tr. 507.   The following findings support this

conclusion.

> For the year ending 1996, the year immediately before the legal
> marriage in Florida, the wage earner filed a United States tax
> return as a "single" individual (Exhibit 22 pg. 174) [Tr. 406].
> There is no indication that the parties ever filed a joint tax
> return.[9]   Also of note, the claimant, herself, filed a tax return in
> Sweden in June 1997 in which she also listed herself as a
> "single person." (Exhibit 22, pg. 118) [Tr. 350].   Further, the
> decedent declared himself a "single person" for purposes of
> deeding property into a trust in the State of Florida in 1996
> (Exhibit 20, pg. 1) [Tr. 224].   In a February 1996 Trust
> agreement, he also described himself as a "single person"
> (Exhibit 22, pgs. 64-79) [Tr. 296-311; *see supra* at 18 n.5].

> When questioned about the 1996 U.S. tax return, the
> claimant previously testified that the wage earner had read
> something pertaining to tax filing status and had told her that
> if they had filed married and it was not a "traditional"
> marriage, they would be living under a "lewd and suspicious
> something", which he did not want to do (Tr. 488).   Yet,
> neither the claimant nor her attorney provided this
> documentation, and neither the claimant nor her attorney
> provided documentation establishing that the Internal
> Revenue Service ("IRS") does not recognize Colorado
> common law marriages for tax filing purposes.   The
> claimant also offered no explanation as to why the wage
> earner declared that he was a "single person" in a 1996
> Warranty Deed (Exhibit 20, p. 1) [Tr. 224] and 1996 Trust

---

9   *See* Rodriguez v. Medina, 765 P.2d 618, 619 (Colo. App. 1988), finding that
filing separate income tax returns and decedent continuing to use her name supported
trial court's conclusion that no common law marriage existed despite the parties living
together for approximately seven years.   The trial court had found that the decedent
and Medina discussed getting married, but the decedent decided not to marry after
learning her Social Security benefits would be discontinued if she married.   *Id.*   In the
present case, Plaintiff did not use Elgerd's surname.   Tr. 483, 507.

Agreement (Exhibit 22, pgs. 64-79) [Tr. 296-311; *see supra* at 18 n.5].

****

She did not provide evidence that she used decedent's surname on a consistent basis and she indicated she continues to use her maiden name (Exhibit 18, pg. 14) [Tr. 191].   Notably, when the decedent completed a Durable Power of Attorney in May 1997, before the legal·marriage, he appointed, "my friend ULLA RICHTNER" as his attorney in fact (Exhibit 22, pg. 86) [*see supra* at 19 n.6].   If they were married, then I would expect that the wage earner would have referred to the claimant as "my wife."   The claimant notes that she is listed as his wife in his obituary in September 1997 (Exhibit 22, pg. 108) [Tr. 340].   However, by the time of his death, they were in fact, legally married in the state of Florida.

I find that the wage earner's sworn statements, including the Durable Power of Attorney (1997), Warranty Deed (1996), Trust Agreement (1996) and tax forms (1996), establish that he and the claimant were not married prior to May 1997.   Furthermore, if the claimant and the wage earner were already married under Colorado common law, then there would have been no need for the May 10, 1997 formal marriage in the State of Florida.[10]   Notably, when they applied for the Florida marriage license, the claimant and wage earner indicated that they were both

---

10   "Although the Colorado courts have held that future plans of a formal ceremony would not negate a present agreement to be husband and wife, there is nothing in Colorado or Arkansas law which prevents considering such plans as evidence of what the intent of the parties was.   In the cases relied on by the appellant the evidence of a common law marriage was virtually conclusive."   Knaus v. Reylea, 746 S.W.2d 389, 392 (Ark. Ct. App. 1988) (citation omitted).   In Knaus, the court determined that "the evidence is not as overwhelming in support of a common law marriage, and therefore, it was not error for the probate judge to consider the future marriage."   *Id.* at 392.   The probate judge had determined "that plans for a future ceremony were contrary to a present agreement between the appellant and Mark Relyea to be husband and wife."   *Id.*

residents of Florida but that they resided in different counties. She lived in Sarasota County and he lived in Alachua County (Exhibit 21) [Tr. 232].   The claimant previously testified that they entered into the Florida marriage because the wage earner had become sick, she had only six months left on her Visa, and they wanted to live in the United States together.   Additionally, the claimant stated that the wage earner was also concerned that she did not have health insurance and that they felt that it would be easier to obtain health insurance under the wage earner's employer plan if they had a traditional marriage. However, no documentation was provided to establish that the claimant was either denied insurance coverage, or would have been denied insurance coverage, because of an insurance provider's failure to recognize a Colorado common law marriage.   Furthermore, in an affidavit completed by the claimant in March 2012, she indicated that the wage earner had previously maintained insurance coverage for her, first through a Swedish insurance carrier and then through Blue Cross/Blue Shield. (Exhibit 18, pg. 14) [Tr. 191].   Hence, it appears that she already had insurance.

[consideration of INS application, *see supra* at 21-22]

Tr. 507-09.   The ALJ concluded the findings:

In deciding that the claimant and the wage earner were not married prior to May 10, 1997, I also considered the briefs/memoranda submitted by the claimant's attorney, the testimony of the wage earner's daughter, the statements from third parties, including friends, family and acquaintances in Sweden, Florida and Colorado, as weII as documents provided to INS, and photos of the claimant and the wage earner at family events (Exhibits 8, 18, 22, 24, Exhibit "A").   While this documentation supports that the claimant and the wage earner enjoyed a long-term, committed relationship, I am not persuaded that this relationship rose to the level of marriage at any time prior to May 10, 1997.   It [sic] The wage earner completed multiple

legal documents declaring that he was "single" during the time that the claimant alleges a common-law marriage. There is also no indication that the State of Colorado recognized that the claimant and the wage earner were married under its common law.

Accordingly, I find that for purposes of establishing entitlement to widow's insurance benefits under the Social Security Act, the claimant and the wage earner were not married at any time prior to May 10, 1997.

Tr. 507-09.

## C.

Plaintiff submitted affidavits and statements from herself and others indicating that she and Elgerd had a marital relationship, but the statements do not establish that Elgerd had consented or agreed that he and Plaintiff were common-law married, particularly in light of his other actions discussed above. Tr. 507-09. As the Nebraska Supreme Court noted in discussing common-law marriage under Colorado law:

The *Lucero* court was concerned with evidence that manifests the parties' *intent* to have a marital relationship. If their intent can be shown by other persons' assumptions based solely on their cohabitation or committed relationship, then a court could find that a cohabitating couple was legally married even if the couple did not intend to create a marital relationship.

Spitz v. T.O. Haas Tire Co., 815 N.W.2d 524, 529 (Neb. 2012) (noting fact that party executed documents, such as a W-4 form and life insurance forms and deeds as a single person supported a finding of no Colorado

common-law marriage, *id.* at 530).   The ALJ was not required to disprove that a common-law marriage existed; Plaintiff had the burden to prove she and Elgerd were married in Colorado under Colorado's common-law marriage statute.   *See* Lucero, 747 P.2d at 644 n.6.

Most telling is what the record reflects with respect to Elgerd's intent. In the light most favorable to Plaintiff, Plaintiff and Elgerd had been living together since June 13, 1985, when they moved to Colorado for the summer months.[11]   Vacationing in Colorado together became a yearly event.   That they surrounded themselves with family, friends, and acquaintances is beyond question – they support Plaintiff.

Putting aside the fact that Elgerd and Plaintiff did not file a U.S. tax return as a "joint tax return," and Elgerd that filed a tax return as a "'single' individual," during the putative common-law marriage, Tr. 507, if Elgerd believed he was married to Plaintiff from 1985 through May 6, 1997, there is no explanation why he referred to himself, in legal documents, especially

---

[11]   The ALJ noted that at the time they applied for the Florida marriage license, May 7, 1997, Tr. 232, both indicated that they were residents of Florida, but resided in different counties.   Plaintiff lived in Sarasota and Elgerd in Alachua County.   Tr. 232, 508.   At the first hearing, Plaintiff explained that she "had a residence there, a small apartment there was, you know, but I was -- yeah."   Tr. 482.   "It was [her] parents' apartment, and they had that from --."   She "had been living there off and on . . . [s]ince 1978."   *Id.*

in 1996 and 1997, as "*a single person*," and in other legal documents

referred to Plaintiff as "Grantor's *friend*," and "my *friend*," or when planning

for the future distribution of money to Plaintiff as "Grantor's *friend* ULLA

E.M. Richtner."   *See supra* at 18-19 nn.5-6.   (emphasis added).   It

appears these documents were prepared and executed in Gainesville,

Florida, and span from February 15, 1996, to May 5, 1997, five days before

the ceremonial marriage in Florida.   Tr. 296-312, 318-22.   (One document

is dated May 6, 1997.   Tr. 289-95.)   These documents could reasonably

be construed to indicate Elgerd's intent – he considered himself single and

not married until the ceremonial marriage on May 10, 1997.

Notwithstanding the above, the INS decision warrants further

discussion.[12]   Plaintiff, by different counsel, filed an I-360, Petition for

Widow of a United States Citizen (Petition) with the INS on or about August

26, 1999, (signed by Plaintiff on August 23, 1999, Tr. 248) on behalf of

Plaintiff who represented she was a widow of a U.S. citizen (Elgerd) who

died within the past two years.[13]   Tr. 245.   Elgerd is named as her

---

[12]   In a footnote, Plaintiff mentions the INS filing, cites to the INS law, the ALJ's characterization of the law, and concludes the ALJ "erroneously quotes from and discusses the current version of the statute and not the version that was in effect in 1999."   ECF No. 12 at 8 n.3.   In the prior case before this Court, it was said: "Based upon all of this evidence the [INS] granted Plaintiff's petition for permanent resident status on October 12, 1999."   Tr. 528.

deceased spouse who she lived with from June 1985 until August 1997. Tr. 247. The marriage date is May 13, 1997 in Gainesville. *Id.* In the letter, counsel directs the attention of INS to the "[d]etailed evidence and law . . . submitted concerning the common law marriage of [Elgerd] and his wife dating from June 1985 to August of 1997." Tr. 233 (Exhibit 22 at 1 of 191).

Counsel's August 26, 1999, letter to INS included many documents that are identified as 1 through 32, Tr. 234-38 (Exhibit 22). The identified documents include several "legal documents" under item 14, including the February 15, 1996, amendment to Elgerd's trust naming Plaintiff "as a residuary beneficiary"; the May 5, 1997, durable power of attorney "naming [Plaintiff Elgerd's] attorney in fact"; and the "Warranty Deed in which [Plaintiff] is granted [Elgerd's] home . . ." Tr. 236. According to the "List of Exhibits," Tr. 1, Exhibit 22 is identified as the "Petition" at Tr. 233-423.

On October 12, 1999, the INS issued an "[a]pproval notice" to Plaintiff that recites, in part: "Widow(er) of U.S. Citz who died in the past 2 yrs,

---

[13] The petition was required to be filed within two years after the spouse died. 8 U.S.C § 1151(b)(2)(A)(i) (1999); *see* Tr. 239 (counsel mentioning "imminent two year date of [Elgerd's] death"). Elgerd died on August 30, 1997. The INS notice of action receipt date on the INS approval form is September 15, 1999. Tr. 36, 204.

201(b)(2)(a)(1)."   Tr. 36, 204.     The case type was a "PETITION FOR

AMERASIAN WIDOWER OR SPECIAL IMMIGRANT."   *Id*.

At the time the application was filed in 1999, immigration law required

Plaintiff and Elgerd to have been married for a period of at least two years

at the time of his death on August 30, 1997.   8 U.S.C. § 1151(b)(2)(A)(i)

(1999) ("In the case of an alien who was the spouse of a citizen of the

United States *for at least 2 years at the time of the citizen's death* . . . .)

(emphasis added).   In 2009, Congress deleted the emphasized language:


<< 8 USCA § 1151 >>

(1) IN GENERAL.--The second sentence of section 201(b)(2)(A)(i) of
the Immigration and Nationality Act (8 U.S.C. 1151(b)(2)(A)(i)) is
amended by striking "for at least 2 years at the time of the citizen's
death".

P.L. 111-83, Title V, § 568(c) (Oct. 28, 2009).

The ALJ noted Plaintiff's "position was that the Immigration and

Nationality Act, 8 U.S.C. § 1151(b)(2)(A)(i) required a two-year marriage for

a person to be recognized as a widow of a deceased citizen (Exhibit 24,

pg.34)."   Tr. 508-09.   Plaintiff points out that the ALJ erroneously relied,

however, on the current version of this law, ECF No. 12 at 8 n.3, which

does not have the 2-year language.   Tr. 509.   Quoting from and relying on

the current language, the ALJ states: "The actual text seems only to indicate that the claimant must have filed her petition within 2 years of the wage earner's death.   *Thus, this section does not provide support for the finding that the INS accepted that the parties had a valid common law marriage.*"   *Id.* (emphasis added).   These conclusions are problematic.

The INS approved the Petition, although the approval notice is rather cryptic.   Tr. 36, 204.   The only reasonable conclusion that Plaintiff and Elgerd were married "for at least 2 years at the time of the citizen's death," is to infer that they had a common-law marriage in Colorado as represented by Plaintiff to INS, and the INS implicitly so found.   The INS Petition was supported by some of the same favorable information considered by the ALJ, and included the evidence substantially detracting from Plaintiff's position, such as the "legal documents" referred to above.

The ALJ reached a conclusion regarding the factual premise(s) and legal efficacy of the INS determination based on an erroneous interpretation of the INS law.[14]   Tr. 509.   Nevertheless, the ALJ considered the INS application and supporting documents and concluded

---

[14]   The Commissioner mentions Plaintiff did not cite legal authority requiring the ALJ to adopt the decision of another agency, here INS, and no authority preventing the ALJ from reaching a different conclusion, as long a substantial evidence supports the ALJ's decision.   ECF No. 13 at 18-19; *see* Tr. 508 (ALJ reaching this conclusion).

that this information, among other information provided by Plaintiff,

supported her claim that she and Elgerd "enjoyed a long-term, committed

relationship," but did not support the conclusion "that this relationship rose

to the level of marriage at any time prior to May 10, 1997."   The ALJ then

stated: "The wage earner completed *multiple legal documents* declaring

that he was '*single*' during the time that the claimant alleges a common-law

marriage."   *Id.* (emphasis added).   These same "legal documents" were

apparently sent to INS, but with a different emphasis by counsel.   *See*

Tr. 235-36 (item 14.(1)-(4)).

     The ALJ relied on the correct statute, but wrong version – the law

was amended in 2009 – leading to the ALJ's erroneous conclusion that

8 U.S.C. § 1151(b)(2)(A)(i) "does not provide support for the finding that the

INS accepted that the parties had a valid common law marriage in

Colorado."   Tr. 509.   Although there is evidence to support the ALJ's

ultimate decision, it is uncertain, however, whether the ALJ would have

reached the same conclusion regarding Plaintiff's alleged common-law

status if she had considered the applicable INS law in light of the INS

determination.   Stated otherwise, it is uncertain whether the ALJ would

have determined that the INS law provided "support for the finding that the

INS accepted that the parties had a valid common law marriage in

Colorado," and, weighed that determination more heavily in reaching the

ultimate conclusion whether Plaintiff was entitled to widow's insurance

benefits.   No party addressed the harmless error standard and the

undersigned declines to address it sua sponte.

Based on a thorough review of the record and the parties' arguments,

it is concluded that the ALJ reversibly erred as noted above such that this

case should be reversed and remanded for further proceedings consistent

with this Report and Recommendation.   At the very least, the ALJ should

re-evaluate her decision in light of a proper application of 8 U.S.C.

§ 1151(b)(2)(A)(i).   If this recommendation is adopted, this case should be

expedited on remand given the age of the matter, a prior reversal and

remand, and the age of Plaintiff.

## V.  Conclusion

Pursuant to the fourth sentence in 42 U.S.C § 405(g), it is respectfully

recommended that the decision of the Commissioner to deny Plaintiff's

application for widow's insurance benefits be **REVERSED** and this case

**REMANDED** for further proceedings and judgment entered for Plaintiff.

**IN CHAMBERS** at Tallahassee, Florida, on July 23, 2018.

s/   **Charles A. Stampelos**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2).   A copy of the objections shall be served upon all other parties.   A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.   Fed. R. Civ. P. 72(b)(2).   <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control</u>.   If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a Report and Recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.   *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.